Mary Ellen WINSTON,
Plaintiff-Appellee,

v.

MEDIAFARE ENTERTAINMENT COR-
PORATION, Gallavants, Inc., and
Ralph Smith, Defendants-Appellants.

No. 1316, Docket 85-7191.

United States Court of Appeals,
Second Circuit.

Argued June 19, 1985.

Decided Nov. 14, 1985.

As Amended Jan. 9, 1986.

Martin Zuckerbrod, New York City (Zuckerbrod & Taubenfeld, New York City, of counsel), for defendant-appellant Mediafare.

Arthur Kokot, New York City (Kay, Collyer & Boose, New York City, of counsel), for plaintiff-appellee.

Before VAN GRAAFEILAND and PRATT, Circuit Judges, and RE, Chief Judge of the United States Court of International Trade, sitting by designation.

GEORGE C. PRATT, Circuit Judge:

Defendants appeal from a judgment of the United States District Court for the Southern District of New York, Abraham D. Sofaer, *Judge*, enforcing what plaintiff characterizes as a fully consummated settlement agreement reached among the parties. In ordering enforcement the district court determined that the parties had reached "what both sides understood to be a final and binding agreement." Because we hold that no binding agreement was reached, we reverse and remand for further proceedings.

BACKGROUND

In May 1983 Marcus & O'Leary, Inc., owner of the title and rights to a series of characters known as "The Gallavants", agreed to sell a 50 percent interest in those characters to Mediafare Entertainment Corporation for the purpose of media exploitation of the characters. Pursuant to this agreement, Marcus & O'Leary and Mediafare formed a corporation called Gallavants, Inc. Defendant Ralph Smith is the president of Mediafare. Plaintiff Winston was allegedly instrumental in bringing together Marcus & O'Leary and Mediafare,

and when a dispute arose over Winston's entitlement to a finder's fee she commenced this action in the Southern District of New York.

In anticipation of a status conference with the court scheduled for May 14, 1984, Arthur Kokot, counsel for plaintiff, met with Martin Zuckerbrod, trial counsel for Mediafare, and Edward Marcus, defendants' general counsel, on May 9 to discuss settlement. At that meeting the parties orally reached an agreement in principle pursuant to which plaintiff was to be paid $62,500 in five installments as a non-refundable advance against a percentage of gross revenues from the exploitation of the "Gallavants" characters. Since settlement appeared likely, Kokot informed the district court that the status conference would be unnecessary and requested the court to enter a "30-day order", pursuant to which a case is closed and remains closed unless a party moves to reopen it within 30 days.

Settlement negotiations continued, and on May 17 Zuckerbrod sent Kokot a copy of the original agreement between Mediafare and Gallavants to aid Kokot in preparing the settlement agreement. Kokot forwarded a first draft of the settlement agreement ("first draft") to Zuckerbrod and Marcus on May 23. Since Zuckerbrod had been retained only as trial counsel, it was Marcus who handled the remainder of the settlement negotiations for defendants. In a letter dated June 6 Marcus accepted Kokot's proposal that plaintiff would receive 2 percent of the gross profits obtained from exploitation of the Gallavants characters, but suggested four separate changes in the "first draft". Kokot incorporated three of the four changes into a "second draft" which he sent to Marcus on June 20. With respect to the fourth suggestion, a matter referring to the definition of gross revenues, the district court found that Marcus and Kokot had reached an oral understanding that no changes in the language of the "first draft" would be required. Along with four copies of the "second draft" Kokot enclosed a promissory note to be signed by Mediafare and guaranteed by Smith. Kokot wrote that he looked forward to receiving Mediafare's check for $15,000, and the executed contract, and he promised to hold the check in escrow "pending execution by my client and delivery to you of two fully executed copies of the agreement."

After making various new language changes in the agreement, Marcus on June 28 sent to Kokot four copies of a "third draft" of the agreement. These copies were signed by Mediafare and Gallavants, Inc. and were accompanied by the original executed promissory note, signed and guaranteed as requested; three copies of a stipulation of discontinuance, signed by Zuckerbrod; and a check for $15,000. In his transmittal letter, Marcus stated that all of the enclosures were to be held in escrow until "two fully executed copies [of the agreement and stipulation] are returned to me."

The record does not clearly reflect the events that took place in the four weeks from June 28 to July 26. What is clear, however, is that Marcus and Kokot discussed by telephone the additional language changes that Marcus had inserted into the "third draft" before returning it, signed, to Kokot on June 28. Kokot stated that he "didn't understand why" Marcus had made the language changes, that Marcus had not consulted Kokot about the changes, and that the changes "surprised" him and "didn't seem to be accomplishing what [Marcus] wanted them to accomplish." Kokot testified that in the course of their telephone conference he and Marcus "went through the changes that [Marcus] had made on the face of the document", and that he and Marcus "worked it out a second time".

On July 26 Kokot sent Marcus four copies of a "fourth draft" of the settlement agreement, reflecting the changes that the district court ultimately found had been agreed to during the telephone negotiations that took place between June 28 and July 26. When, on July 30, Kokot called Marcus to inquire about the return of executed copies of the "fourth draft", Marcus stated

that the principals of Mediafare and Gallavants were dissatisfied with the terms of the settlement and refused to proceed.

On July 31, Kokot wrote Marcus, informing him that he was releasing Mediafare's check from escrow and enclosing what Kokot characterized as "two fully executed copies of the agreement". But the enclosed agreement was not simply the "fourth draft" Kokot had sent to Marcus on July 26. Instead, Kokot took two copies of the "fourth draft" from which he removed the blank signature page and substituted therefor the signature page from the "third draft", which Mediafare and Smith had signed on June 28, but which had proved unacceptable to Winston.

In a letter dated August 1, apparently mailed before Marcus received Kokot's July 31 letter and its enclosures, Marcus stated that Marcus & O'Leary objected to Gallavants, Inc. being part of the settlement and that therefore "we cannot proceed with [the settlement] at this time". On August 6, after receiving the papers forwarded by Kokot on July 31, Marcus wrote to Kokot objecting to Kokot's characterizing the July 31 agreement as binding, and, on August 9, Marcus demanded that Kokot return the $15,000 check, the promissory note, and the agreement. Instead of complying Kokot on August 10 wrote to the district court stating that defendants have "attempted to disavow a binding settlement agreement."

After determining that expiration of the 30-day period did not bar a reopening of the case because the clerk had neglected to docket the 30-day order, the district court held a hearing at which Kokot and Marcus testified. Based upon the testimony at this hearing, the court found that the parties had entered into a "binding settlement agreement which plaintiff is entitled to enforce." Defendants appeal.

## DISCUSSION

Under New York law, parties are free to enter into a binding contract without memorializing their agreement in a fully executed document. This freedom to contract orally remains even if the parties contemplate a writing to evidence their agreement. In such a case, the mere intention to commit the agreement to writing will not prevent contract formation prior to execution. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984); *Municipal Consultants and Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 149, 417 N.Y.S.2d 218, 220, 390 N.E.2d 1143, 1145 (1979); *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969). On the other hand, if either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract. *R.G. Group*, 751 F.2d at 74. Because of this freedom to determine the exact point at which an agreement becomes binding, a party can negotiate candidly, secure in the knowledge that he will not be bound until execution of what both parties consider to be final document.

In any given case it is the intent of the parties that will determine the time of contract formation. To discern that intent a court must look to "the words and deeds [of the parties] which constitute objective signs in a given set of circumstances." *Id.* We have articulated several factors that help determine whether the parties intended to be bound in the absence of a document executed by both sides. The court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing. *See generally id.* at 75–77; *see also* Restatement (Second) of Contracts § 27 comment c (1981). These circumstances may be shown by "oral testimony or by correspondence or other preliminary or partially complete writings." Restatement (Second) of Con-

tracts § 27 comment c (1981). Considering these factors in the context of this case, we are left with the definite and firm conviction" that the district court erred in concluding that the parties here intended that a binding agreement could be reached prior to execution of a final document satisfactory in every respect to both sides. *Anderson v. City of Bessemer*, —— U.S. ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

## A. *Express reservation?*

Although neither party expressly reserved the right not to be bound prior to the execution of a document, language in the correspondence does reveal such an intent. In his May 11 letter to the district judge, Kokot requested that the court enter the 30-day order "subject to consummation of the proposed settlement", and in his letter of May 23, Kokot stated that he was transmitting a copy of "the proposed agreement". These writings make clear that Kokot, the attorney who sought to prove that a binding oral agreement had been reached, had considered unexecuted versions of the agreement to be nothing more than drafts or proposals and not, as he later testified, final binding agreements. Even more significant is the statement in Kokot's June 20 letter promising to hold the $15,000 check "in escrow pending execution by my client and delivery to you of two fully executed copies of the agreement." By this language Kokot confirmed the obvious understanding that the settlement contract would not be effective until executed by both sides.

The trial court's incomprehensible finding that "Kokot was * * * merely promising to cash the check only after both sides [had] 'executed' the agreement, *in the sense the parties intended in this case*" (emphasis added) is supported by neither logic nor the acts of the parties. First, there is no indication by the district court of how Kokot's language imparts some special "sense" to the way in which the parties intended to execute their agreement. An attorney's request that another party execute and return documents, cou-

pled with his promise to hold a check in escrow until his own client has also signed those documents, strongly suggests an intent that the agreement must be reduced to a written, signed document that would become effective only when fully executed. It certainly does not convey any out-of-the ordinary meaning or "sense" of the term "execute".

Second, if Marcus believed, as he testified, that the agreement became binding as of the May 9 meeting, there was no logical reason for him to defer cashing the check until the documents had been "fully executed". Kokot sought to explain his behavior by saying that "what I was doing was protecting the defendant, not reserving any rights on behalf of the plaintiff." This explanation is implausible, however, in that Kokot was Winston's attorney, retained and paid to protect *her* interest. To have withheld from his client money that he believed she was entitled to immediately would have been unethical and improper, an attitude we do not attribute to Kokot. The compelling conclusion is that he held up delivery of the check simply because, as required by their understanding, the formal documents had not yet been fully executed and delivered.

Noting that two provisions in the draft of the agreement sent by Marcus to Kokot on June 28 "appear to place importance on the formalities of execution", the district court concluded that "neither of these provisions was actually treated * * * as an impediment to forming a binding agreement prior to some formal time of mutual execution." Here again, the district court's construction is unsupported by the writings of the parties.

The first provision referred to by the district court reads, in pertinent part, "on the Execution Date Mediafare shall deliver to Winston a promissory note * * *." The second provision provides for the mutual release of all claims between the parties and requires that "their attorneys shall execute simultaneously herewith a stipulation of discontinuance of the action in the form annexed hereto." Since Mediafare deliv-

ered both the signed promissory note and the stipulation of discontinuance to Kokot on June 28, the district judge concluded that "the Execution Date, contemplated was the date on which each party separately signed, so long as a firm understanding on the terms of the settlement had been reached." But this conclusion cannot be reconciled with either the language of the agreement itself, or the terms of the June 28 cover letter. The agreement reads,

> 1. Mediafare shall hand deliver to Winston the following:
>> a. A non-refundable fee of $62,500 as an advance against all sums accruing to Winston pursuant to subparagraph 1(c) below, accruing and payable: (1) $15,000 on execution hereof (the "Execution Date")

This language is followed by a schedule calling for payments on the anniversaries of the "Execution Date". The June 28 cover letter notes that all of the enclosures, including the $15,000 check, "are to be held by [Kokot] in escrow until two (2) fully executed copies are returned to [Marcus]." In the face of this language, the "Execution Date" cannot rationally be construed as the multiple "date[s] on which each party separately signs". The "Execution Date" had to refer to the single date on which documents signed by both sides were delivered to Marcus.

Finally, even assuming the correctness of the district court's construction of the meaning of "Execution Date", there would still be no support for its conclusion that neither of the two provisions was "an impediment to forming a binding agreement prior to some formal time of execution." On the contrary, the language of the agreement attaches great importance to the "Execution Date", since no money would become payable until that date.

### B. *Partial performance?*

There was no evidence of partial performance of the settlement agreement.

### *Anything left to negotiate?*

We turn to a consideration of the third whether there was "literally nothing to negotiate". *R.G. Group*, 751

F.2d at 76. The district court found that all changes made in the agreement after June 20 related only to language and were not "of any substance". Although the district court may have correctly assessed the parties' characterizations of the relative importance of the later changes, the facts that such changes were minor and that oral agreement was actually reached on all of the remaining terms does not necessarily lead to the conclusion that the parties were bound prior to these modifications. Nor does it indicate an intent to give up the right to be bound only upon execution of a formal document. As we noted in *R.G. Group*, "[t]he actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing." 751 F.2d at 75. That these "unnoticed" or "passed by" points of disagreement may in the long view be fairly characterized as minor or technical does not mean that a binding contract was formed prior to the time that they were finally worked out.

Here, the drafting process revealed several points of disagreement. After the May 9 meeting it was agreed that Kokot would prepare the "first draft". When Marcus received that document he pointed out four problem areas. After those disagreements were worked out Marcus sent a "second draft" to Kokot on June 28, adding several additional language changes. Kokot could have assented to Marcus' proposed contract, but he chose not to, and instead, sent back to Marcus a new document, the "third draft", with more suggested changes. The problems created by these changes were worked out orally sometime between June 28 and July 26. By that time, however, the settlement agreement was no longer acceptable to the defendants.

Where, as here, counsel insist on continually redrafting the specific terms of a proposed agreement, the changes made must be deemed important enough to the

parties to have delayed final execution and consummation of the agreement. Parties that wish to be bound only upon execution of a formal document agree to negotiate in that manner because they wish to create a writing that is satisfactory to both sides in every respect. It is not for the court to determine retrospectively that at some point in the evolution of a formal document that the changes being discussed became so "minor" or "technical" that the contract was binding despite the parties' unwillingness to have it executed and delivered. For the court to do so would deprive the parties of their right to enter into only the exact contract they desired.

### D. *Agreement usually written?*

We turn now to the final factor—whether the agreement at issue here was the type of contract that was usually put in writing. Comparing the complexity of the transaction at issue here to that described in our opinion in *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257 (2d Cir.1984), the district judge observed:

> The transaction negotiated in [this case] is relatively simple, and certainly not comparable to that described in *Reprosystem, B.V.* In *Reprosystem*, "[t]he proposed deal involved a 4 million dollar sale of six companies which were incorporated under the laws of five different countries which had assets of over 17 million dollars, sales of 40 million dollars, and profits of 4 million."

Based upon this comparison the district court concluded that the settlement agreement here was not the type of agreement that must be committed to writing prior to becoming effective.

Although we agree that the transaction at issue here is not as complex as that described in *Reprosystem*, it does not necessarily follow that this settlement agreement was not the type of agreement that generally requires a written contract. On the contrary, the $62,500 at issue is not a trifling amount, and payment was to be made over several years based on a percentage of earnings. Although the agreement consisted of only four pages, the par-

ties evidently thought the terms and language used were complex enough to require substantial redrafting. Where, as here, the parties are adversaries and the purpose of the agreement is to forestall litigation, prudence strongly suggests that their agreement be written in order to make it readily enforceable, and to avoid still further litigation.

In sum, three of these four factors indicate that the parties here intended not to be bound until the formal documents were fully executed and delivered to counsel.

As a final argument, plaintiff contends that even if the parties did intend to require that their agreement be embodied in a written document, such a writing is to be found here in the "fourth draft" which Kokot sent to Marcus on July 31. That document, however, was not a fully executed contract, but a conglomeration of the prior drafts. The signature page of the "third draft" that was executed by Mediafare and Smith was removed by Kokot and attached to a new document, the "fourth draft", in which Kokot had incorporated all the changes allegedly agreed to by July 26. Absent defendants' permission, however, plaintiff had no right to switch signature pages and assemble a new document and seek to treat it as the parties' fully executed, binding agreement.

In short, we hold that the parties never entered into a binding settlement agreement. Our conclusion is supported by the writings and acts of the parties, by the language of the drafts of the agreement, and by the nature of the agreement itself. Accordingly, the judgment enforcing the alleged settlement must be reversed and the case remanded for further proceedings.

Since we remand, we note one final problem. This case was originally brought by Winston against a single defendant—Mediafare Entertainment Corporation. On appeal Gallavants, Inc. and Smith challenge the unusual way in which they were added as parties to the action, and they protest that they have never been served with process and are therefore not properly before the court. Since the effect of our decision

is to reinstate the lawsuit, if plaintiff wishes to add Gallavants, Inc. and Smith as parties defendant she should make a new motion to the district court and, if the motion is granted, she should see that they are properly served with process. *See* 3A *Moore's Federal Practice,* ¶ 21.05[1] (2d ed. 1985).

Reversed and remanded.